(No. 4813-

THOMAS BARRY, ERNEST McCLINTOCK, CLYDE McMILLAN, PETER ALBERT, FRANK SCARCELLI, WILLIAM SCARCELLI, GEORGE KEAGLE, JAMES COSGROVE AND LEONARD LINK, Claimants, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion re liability filed November 16, 1960.*

*Opinion re damages filed May 11, 1965.*

AUGUST B. BLACK, Attorney for Claimants.

WILLIAM G. CLARK, Attorney General; BERNARD GENIS AND SAMUEL J. DOY, Assistant Attorneys General, for Respondent.

WHAM, J.

Claimants in this case each contend they suffered dam-

ages to their property by the flooding caused by the escape of water from the Illinois and Michigan Canal on July 13, 1957 in Troy Township, Will County, Illinois. The complaint charges that respondent negligently failed to maintain the canal bank in a good state of repair so that a break occurred proximately causing the flooding of the lands and damages to claimants' crops and property.

The evidence disclosed that approximately 6.73 inches of rain fell in less than fifteen hours on July 13, 1957, and that a break occurred in the south bank of said canal flooding the land owned and occupied by claimants adjacent to the canal and the surrounding vicinity. The break was approximately fifty feet in width and twelve feet in depth.

The break in the canal was not repaired for some eight or nine days due to the fact that the surrounding area was in such a condition that heavy equipment could not be brought to the site of the break, and it was necessary to repair the roads proceeding to the site, which required two or three days. The flow of water through the break was stopped on the first day of work on the wall.

Claimants contend that this was the second occasion in recent years when the particular portion of the bank gave way, and that respondent, in repairing the first break, used improper materials and methods, which resulted in the bank giving way again on the July 13, 1957 occasion after the heavy rainfall. Claimant, Clyde McMillan, testified that he was certain the break in 1954 occurred on his farm at the same place as it did in 1957, and that the 1954 break was about the same as the 1957 break. Floyd McMillan, son of Clyde McMillan, also testified that the 1954 break at the McMillan farm was at the same place as in 1957. He also testified he observed this break at between 10 and 11 o'clock in the morning of July 13, 1957.

James Cosgrove, claimant, testified that he saw the

break at the McMillan farm in 1954. Claimant, Ernest Mc-Clintock, also saw the break at the McMillan farm in 1954. William Scarcelli, son of the claimant, Frank Scarcelli, testified he saw the break at the McMillan farm in 1954, and observed the manner in which it was repaired. He also saw the repair operations on the 1957 break, and stated in 1954 they did not tamp down the filling, but in 1957 they ran a bulldozer back and forth tamping it down, and also made the bank wider at the bottom than it had been before the 1957 break.

Another claimant, Leonard Link, testified that there was a break on the McMillan farm in 1954, and he had observed at the time the repairs being made by respondent's employees. Mr. Link's occupation is that of a trucking and building contractor, which occupation he has followed for approximately 30 to 35 years. He stated that the repairs to the break in 1954 were not done properly. He stated that they put trees in the break, and that, as the trees deteriorated, the level of the bank at that point gradually sunk down three feet, and the fill soil was not properly compacted. He stated that the 1957 break was repaired with better material, and the soil was properly compacted.

It appears from the testimony that the State had kept no record of the previous breaks. The only testimony offered to oppose that of claimants on this point was that of Roy F. Annis, maintenance man for the Division of Waterways. He testified that he had been a maintenance man on the canal since 1952, and that in 1954 there was a break adjacent to the Scarcelli farm, which was not the same site as the break at the McMillan farm. He testified they used stone, clay, and dirt to repair the break in 1954, and that this was the only previous break in the canal wall. He stated it occurred approximately a mile to a mile and a half from the McMillan farm. On cross-examination, however, he stated that he did

not know whether there was or was not a break at the Mc-Millan farm in 1954.

From the testimony and the record on this point, we find that claimants have borne the burden of proving that the 1957 break occurred at the same place as did that in 1954. We also find from the evidence that the repairs of 1954 were not properly made, and consequently we hold that the State was negligent in the maintenance of the canal bank.

Although there is evidence to the effect that the canal overflowed its banks at a number of locations, as was testified to by Leroy Latz, General Superintendent of the canal, there is nothing in the record to show how much of the flooding of claimants' respective farms was caused by the overflow rather than the break in the canal bank.

From the evidence in this record, we find that the negligence of the State in the maintenance of the canal bank proximately contributed to the cause of the extensive flooding of claimants' property, and the State should respond in damages.

The State raised an "Act of God" defense based on the contention that the rainfall was so extensive that the State could not reasonably be held to guard against it. This defense is not well taken. As stated in 28 Illinois Law and Practice page 106, the law on this question is, "One may not be held liable for injuries to another where an 'Act of God,' or, as it is sometimes referred to, an act of nature, is the proximate cause of the injuries, and one is not guilty of any negligence proximately contributing to such injuries, but in order that this rule may apply it should appear that the 'Act of God' or of nature is the sole proximate cause of the injuries." This rule is applied and stated in *Miller* vs. *Mobile & Ohio Railroad Company*, 265 Ill. App. 414 at 418, wherein the court stated with regard to a question of this

defense, "Before he can invoke the rule, he must be free from negligence, which was a proximate cause of the damage."

Moreover, the evidence established that the rainfall of July 13 was not unprecedented, and, in fact, had been exceeded on one occasion as demonstrated by exhibit A, a certified copy of a weather report of the State Climatologist, United States Department of Commerce, Weather Bureau, which indicated that on June 11, 1926 at the same vicinity there was a rainfall of 6.86 inches.

Then, too, the doctrine is well established that, although a rainfall may be more than ordinary, there is a duty to provide against the consequences of such rainfall. In *Drda* vs. *Illinois Terminal Railroad Company*, 210 Ill. App. 640 at 648, the court stated: "The doctrine is well established that, although a rainfall may be more than ordinary, that is extraordinary, yet if it be such as has occasionally occurred, even though at irregular intervals, it is to be foreseen that it will occur again, and it is the duty of those changing or obstructing the flow of water to provide against the consequence of such a rainfall. . . . Even though the rainfall of August, 1916 had been unprecedented, yet if the act of the appellant in constructing its bridges and embankments contributed together with such unprecedented flow of water to the flooding of appellee's lands, appellant would be liable at law for injury caused thereby."

In 94 C.J.S., Sec. 365 at page 432, it is stated: "The owner of an irrigation ditch or canal, being bound to exercise reasonable care and prudence in the construction and management thereof, is ordinarily liable in damages for injuries resulting from the breaking, leakage, or overflow of such canal or ditch when caused by the want of the required care." And at page 436 it is stated: "A flood must have been so extraordinary and unprecedented manifesta-

tion of nature as could not have been reasonably anticipated or foreseen to come within the term 'Act of God'."

Claimants also contend that the locks at Channahon, Illinois were defective, and that the gate tender was unable to open the locks, and that, because of such defective condition, respondent was unable to lower the level of the canal, and thus relieve the flooded condition of claimants' land. These gates, when opened, direct the flow of canal water into the DuPage River, and it is undisputed that gate No. 3 could not be opened, and gate No. 2 could only be partially opened. These locks were located some five or six miles downstream from the break. It appears from the records of the Department of Public Works and Buildings that an inspection of the locks had been made on June 7, 1957, which revealed that the gates needed replacing and other repair work was necessary. It also appears from the testimony that the repairs were not made until August 19, 1957.

The testimony of respondent established that the gates at Channahon, Illinois controlled the water for only about four miles upstream. It is respondent's position that it would make no difference whether the gates were open or closed after a certain point upstream was reached.

Mr. Ralph O. Fisher, Assistant Principal Engineer of the Division of Waterways, testified to these facts as an expert. No testimony was offered by claimants to the contrary. We, therefore, hold on this issue that claimants have not borne the burden of proof with respect to the defective locks proximately causing any damage.

The evidence establishes to our satisfaction that the lands of all claimants were extensively flooded, and that they are entitled to recover damages, inasmuch as respondent's negligence in maintaining the canal bank proximately contributed to cause the flooding condition.

On the question of damages, however, the record is for the most part unsatisfactory, and this Court will not speculate in attempting to arrive at the amount of damages.

In view of the fact that no objection was made at the time of the hearing regarding the proof of damages, we are re-submitting this case to the Commissioner for further proof on the question of damages, and will withhold passing on any of the claims until the proof on the damage question is completed.

It is, therefore, ordered that the record in this case be re-submitted to the Commissioner, and that claimants and respondent offer further evidence on the question of damages.

AUGUST B. BLACK, Attorney for Claimants.

WILLIAM G. CLARK, Attorney General; BERNARD GENIS, Assistant Attorney General, for Respondent.

PER CURIAM:

The facts in this claim have been set forth previously in the opinion rendered by Judge Wham, which was filed in this Court on November 16, 1960. In the opinion the Court stated: "From the evidence in this record, we find that the negligence of the State in the maintenance of the canal bank proximately contributed to the cause of the extensive flooding of claimants' property, and the State should respond in damages." Pursuant to the order entered in that opinion, a further hearing was held on February 16, 1961 as to the damages sustained by claimants. From this evidence the Court finds as follows:

1. Claimant, Clyde McMillan, lost 20 acres of corn with a probable yield of 80 bushels per acre and at a selling price of $1.04 per bushel, less a reduction of $7.00 per acre for cost of harvesting.

2. Claimant, James Cosgrove, lost 18 acres of corn with a probable yield of 60 bushels per acre and at a selling price of $1.04 per bushel, less a reduction of $7.00 per acre for cost of harvesting and $100.00 for salvage.

3. Claimant, William Scarcelli, lost 15 acres of corn with a probable yield of 75 bushels per acre and at a selling price of $1.04 per bushel, less a reduction of $7.00 per acre for cost of harvesting. In addition, claimant also lost 25 acres of soy beans with a probable yield of 30 bushels per acre and at a selling price of $2.15 per bushel, less a reduction of $7.00 per acre for cost of harvesting.

4. Claimant, George Keagle, lost 5 acres of corn with a probable yield of 80 bushels per acre and at a selling price of $1.04 per bushel, less a reduction of $7.00 per acre for cost of harvesting.

5. Claimant, Leonard Link, suffered damages to his basement, sump pump, motor, and furnace as the result of the flooding. There were also damages to canned food in the basement, as well as miscellaneous damages to the exterior and interior of claimant's property.

6. Claimant, Thomas Barry, lost 35 acres of soy beans with a probable yield of 30 bushels per acre and at a selling price of $2.15 per bushel, less a reduction of $7.00 per acre for cost of harvesting.

7. Claimant, Peter Albert, suffered property damage loss as a result of the flooding to the extent that a driveway was washed away, the replacement cost for which totalled $96.00. In addition, claimant's well was flooded and condemned, which necessitated the drilling of a new well, and the purchase of a new pump.

8. Claimant, Frank Scarcelli, had 18 acres in asparagus, 12 acres of which were totally destroyed. A probable gross income of $260.00 per acre, less a reduction of $80.00 per

acre for the cost of harvesting and marketing, would make a loss of $180.00 per acre.

9. Claimant, Ernest McClintock, lost 5 acres of corn with a probable yield of 80 bushels per acre and at a selling price of $1.04 per bushel, less a reduction of $7.00 per acre for cost of harvesting. In addition, claimant also lost 30 tons of clover hay at a selling price of $20.00 per ton, less a reduction of $5.00 per ton for the cost of baling and storing. A claim for the loss of a seed crop was also made. We estimate this loss at 30 bushels of clover seed with a probable selling price of $24.00 per bushel, less the cost of mowing, combining and cleaning in the amount of $6.00 per bushel.

In addition to the foregoing, claimant, Robert Mc-Clintock, also alleged damages for the loss of top soil. It is the opinion of this Court, however, that the evidence in this matter is not such that would warrant an award for this alleged loss.

Awards are, therefore, made to claimants in the following amounts:

| | |
|---|---:|
| Clyde McMillan | $1,524.00 |
| James Cosgrove | 897.00 |
| William Scarcelli | 2,502.50 |
| George Keagle | 381.00 |
| Leonard Link | 800.00 |
| Thomas Barry | 2,012.50 |
| Peter Albert | 497.14 |
| Frank Scarcelli | 2,160.00 |
| Ernest McClintock | 1,371.00 |